IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Abigail P., through her Parent, Sarah F. of Old Forge, Pa. 18518 | : : : : : : : : : : : : : : | Civil Action No. |
| Plaintiff | | |
| v. | | |
| Old Forge School District 300 Marion Street Old Forge, Pa. 18518 | | |
| Defendant | | |

# COMPLAINT

## I.  Preliminary Statement

1.  Abigail P., a minor child with disabilities ("Abigail" or "Student"), and her parent ("Parent"), Sarah F. (collectively referred to as "Plaintiff" or "Family"), bring this action against Old Forge School District ("District" or "Defendant") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and its federal and state implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and its federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.  Abigail is a student with severe disabilities including Intellectual Disability, moderate to severe Autism Spectrum Disorder, Cognitive Communication Disorder, and Speech Sound Disorder, and a history of global developmental delay and Epilepsy. She is non-verbal, relies on a communication device, functions cognitively in the less than 0.1 percentile, and needs constant redirection to tasks.

3.  Abigail's disabilities require, among other supports, in-person and one-on-one

instruction to enable her to make meaningful educational progress. The District did not provide such instruction from November 24, 2020 to February 16, 2021, and also on March 12, 2021, March 19, 2021, April 26, 2021, and April 27, 2021 during the COVID-19 pandemic. During this period, the District provided Abigail with virtual education and an inappropriate and insufficient version of her Individualized Education Program ("IEP"). Abigail regressed behaviorally and failed to make meaningful educational progress.

4. The United States Department of Education unequivocally stated that school districts remain obligated to provide a Free Appropriate Public Education ("FAPE") to students with disabilities during the COVID-19 pandemic. The pandemic did not reduce or excuse the District's obligations to Abigail. Despite the District's obligation to provide Abigail a FAPE during the pandemic, it provided only inappropriate virtual instruction during the period at issue.

5. What is more, while the District was closed for in-person learning, it allowed in-person varsity sports, including practices and games against other competing districts. Thus, while entire teams of students assembled together in the District's buildings, Abigail, one of the District's most at-risk learners, was forced to stay at home, where she failed to make progress on her goals for basic communication and life skills.

## II. Procedural History

6. On March 4, 2021, the Family filed an administrative Due Process Complaint seeking compensatory education arising from the District's failure to provide Abigail with an appropriate program under the IDEA and Section 504 from November 24, 2020 until February 16, 2021.

7. At the due process hearing, the District agreed to permit the Parent to also pursue compensatory education for four additional days when Abigail received virtual instruction (March 12, 2021, March 19, 2021, April 26, 2021, and April 27, 2021) that occurred after the filing of the

Due Process Complaint. Additionally, Parent clarified that the Section 504 claims raised in the Due Process Complaint included a claim for the District's discrimination against Abigail, a student with disabilities.

8. On July 9, 2021, Pennsylvania Hearing Officer ("Hearing Officer") James Gerl conducted the due process hearing which concluded that day. In a decision dated September 7, 2021 ("Decision"), Mr. Gerl incorrectly determined that the District provided a FAPE to Abigail and did not discriminate against Abigail on the basis of her disability. (Decision at 15-17).

9. The Hearing Officer erred in determining that the District provided a FAPE to Abigail during the dates of virtual instruction. The evidence at the hearing clearly established that the District did not provide the specially designed instruction and related services in her IEP, created an insufficient, revised IEP for the virtual setting which was not reasonably calculated to provide meaningful education benefit, provided only one hour and ten minutes of instruction to Abigail per day, and that Abigail regressed behaviorally and failed to make meaningful educational progress.

10. The Hearing Officer also grossly erred when he described as "mandatory" non-binding guidance from the state concerning when to hold or refrain from in-person instruction. This misunderstanding of the evidence presented, and the authority of the guidance led to his erroneous conclusion that the District provided a FAPE and did not discriminate against Abigail on the basis of her disability.

11. The Hearing Officer inexplicably based his unfavorable credibility determination on Parent's accuracy in recalling the details of funding for Student's in-home nurse, an immaterial consideration unrelated to the issues raised by the Parent. His credibility determination is clear error and contrary to the record, which showed agreement and corroboration between Parent's

3

testimony and the testimony of District witnesses as well as the non-testimonial evidence.

12. Accordingly, Plaintiff respectfully requests that this Court reverse the Hearing Officer's erroneous credibility determination, or, in the alternative, hear testimony from the witnesses and make its own credibility determinations.

13. Finally, the Hearing Officer erred when he failed to consider the Plaintiff's Section 504 discrimination claim and determined alternatively that the District did not discriminate against Abigail. In the Due Process Complaint and at the hearing, Parent raised discrimination claims based on the District's decision to allow in-person athletics in school buildings, but not to provide any in-person instruction to Abigail, a student with a disability.

14. The Hearing Officer wrongly found that Parent had failed to raise the issue of discrimination in the Due Process Complaint. The Hearing Officer wrote that, "there is no mention of basketball or extracurricular activities in the due process complaint." (Decision at 15). The Due Process Complaint specifically states that, "the District's athletics department was fully operational and in-person during the entire time period the District advised Abigail's family that they could not provide her the in-person instruction she absolutely needs. . . ." (Due Process Complaint at 2). The Due Process Complaint raises in-person athletics as well as Section 504 violations and the evidence at the hearing established discrimination.

### III.  Standard of Review

15. This Court is required to undertake an independent review of the record and the decisions of the Hearing Officer. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07 (1982); *Susan N. v. Wilson School Dist.*, 70 F.3d 751, 759 (3d Cir. 1995).

16. After fully considering the entire record, this Court should reverse the incorrect Decision of the Hearing Officer and award appropriate relief to the Family for the District's

educational failures, including compensatory education and reasonable attorneys' fees and costs.

## IV.   Parties

17.     Abigail was born in 2011 and is an "eligible student" with disabilities under IDEA. She is also a "protected handicapped student" under Section 504. She has resided in the District at all times at issue in the hearing.

18.     Sarah F. is Abigail's mother. At all times relevant to this action, she has resided with Abigail in Old Forge, Pennsylvania, within the geographical boundaries of the School District.

19.     The Old Forge School District is located at 300 Marion Street, Old Forge, Pennsylvania. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries including those mandated under IDEA and Section 504. 22 Pa. Code Chapters 14 and 15; 24 P.S. Chapter 13.

## V.   Jurisdiction and Venue

20.     This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA and Section 504.

21.     Plaintiff has exhausted administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a special education due process hearing. 20 U.S.C. § 1415(i)(2)(A).

22.     The Family's claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

23.     All of the Defendant's complained-of actions have taken place within the

jurisdiction of the United States District Court for the Middle District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

VI.     **Additional Facts Supporting Liability**

24.     Abigail is a ten-year-old student who receives special education and related services in the District due to her Intellectual Disability (significant global delays in intellectual functioning and everyday adaptive skills), Autism, and Speech and Language Impairment.

25.     Abigail has severe disabilities. Abigail functions cognitively in the less than 0.1 percentile; her cognitive age equivalence is two to three years old. Her attention span is less than five seconds. She exhibits significant weaknesses and delays across neurocognitive domains, including general intellectual functions, expressive language skills, language comprehension, visuospatial analysis, nonverbal patterns analysis, and attention/executive control.

26.     At the due process hearing, the District's superintendent testified that Abigail would "absolutely" be considered one of the District's most at-risk learners.

27.     In adaptive skills – practical, everyday skills needed to function in school, home and the community – Abigail functions significantly below her same-aged peers. She has very low skills in areas such as communication, daily living, play and leisure, and coping.

28.     Abigail also has moderate to severe Autism Spectrum Disorder, so she has significant impairments in social interactions, struggles with communication, and engages in repetitive behaviors which impact her daily functioning at home and in school.

29.     Abigail has a history of Epilepsy and global developmental delays. She requires the support of a nurse for medical needs.

30.     Socially and emotionally, Abigail displays aggression, self-injurious behaviors, atypical behaviors, perseverative and repetitive actions, restricted interests, inattention,

impulsivity, restlessness, anxiety, low frustration tolerance, withdrawal, lack of social cognition and awareness, reduced social motivation, avoidance and lack of compliance, and reduced self-monitoring/coping skills.

31. Abigail is nonverbal and uses unintelligible vocalizations. She requires the use of assistive technology for communicating and school-based speech and language therapy multiple times per week.

32. Abigail requires occupational and physical therapy to work on skills such as tracing the letters in her first name and ascending and descending stairs in her school building.

33. Abigail's IEP provides for full-time Autistic Support with speech/language therapy, occupational therapy, physical therapy, adaptive physical education, specialized transportation, and a positive behavior support plan ("behavior plan") in a highly structured setting with frequent redirection to address her attention regulation.

34. Abigail requires intensive and individualized small-group instruction, including one-on-one instruction following the methods known as "discrete trial learning" and "applied behavioral analysis," and an educational environment and resources to meet her language, social, behavioral, fine motor, and adaptive skills needs. She needs a slow-paced, hands-on, concrete, and highly structured approach to learning and use of manipulatives, visual aids, and meaningful and experiential lesson content. Abigail also requires support for peer and social interactions.

35. The District's Director of Special Education testified that Abigail requires in-person instruction.

36. The District only offered virtual instruction to its students from November 24, 2020 to February 16, 2021, as well as on four additional dates in the spring of 2021: March 12, March 19, April 26, and April 27. During this time, the District did not offer in-person instruction to

special education students but did conduct in-person varsity sports in District buildings, including home and away games with other school districts' teams, beginning on January 4, 2021.

37. During the period when the District provided only virtual instruction, Abigail did not receive the special education and related services in her IEP. As a result, she regressed and failed to make meaningful educational progress.

38. When in school, Abigail received in-person instruction from 8:25 a.m. to 2:30 p.m. each school day.

39. In the virtual setting, Abigail's teacher testified she only had time on the computer with Abigail for about an hour and ten minutes each day.

40. According to Abigail's teacher, Abigail was only provided virtual academic instruction for about 15 minutes each in reading and math. Some days, an aide rather than a certified special education teacher provided the instruction. Abigail received 30 to 40 minutes per day of virtual "circle time" but she could not participate because she could not focus her attention on the screen.

41. Abigail's teacher and mother agreed that the data the District collected about Abigail's learning during virtual instruction was often incorrect because the teacher could not see on the screen what Abigail was doing with her hands and whether she required prompting.

42. The District reduced the expectations of several goals in Abigail's IEP, because of the virtual instruction and not based on any educational progress by Abigail.

43. The District abandoned one goal and did not establish baselines to measure educational progress.

44. While at home, Abigail no longer received the benefit of time with non-disabled peers, a vital piece of her educational program.

8

45. In the home, Abigail was accompanied by a behavior technician, not provided by the District, and a nurse who monitors Abigail's medical needs, but is not trained in the delivery of education.

46. The District reported that it was unable to provide physical therapy present levels of education for Abigail because she could not be assessed virtually. The physical therapy services consisted of Abigail's mother, behavior technician, and nurse modeling and Abigail working on stairs in her home with which she was already very familiar. It did not provide any meaningful benefit to Abigail.

47. The District's occupational therapist recommended that Abigail would not benefit from virtual occupational therapy sessions. The District still provided them, but Abigail was not able to meaningfully participate and did not receive any benefit.

48. Abigail did not receive any benefit from virtual speech and language therapy sessions. The District inappropriately reduced these services significantly from the three, 30-minute individual sessions per week provided in her IEP to one, 30-minute individual session per week.

49. As a result of the inappropriate virtual programming, Abigail's self-injurious behaviors, such as hitting herself, increased. On one occasion, Abigail's mother counted that Abigail hit herself over 70 times in a 30-minute period. Abigail was not able to participate daily in the live virtual instruction due to her behaviors and the teacher would ask that Abigail's mother, nurse, and behavior technician work privately with Abigail.

50. The technology used in the District's virtual programming lacked touch screen capability and impaired Abigail's ability to use her tablet computer to receive instruction. As a result, she would get very frustrated and engage in aggressive and/or self-injurious behaviors.

9

51. Abigail did not make academic and behavioral progress during virtual instruction. Virtual instruction with no in-person support, no in-person peers, and reduced goals and progress monitoring was not appropriate for Abigail and did not provide a FAPE. In fact, District witnesses strongly agreed with Parent that Abigail needs in-person instruction.

52. Abigail's teacher agreed that Abigail's behaviors increased while she was in the virtual setting. Abigail's behaviors did not begin to decrease until she returned to school and received in-person instruction beginning on February 16, 2021 with the exception of the four days identified in paragraph 3.

53. After returning to in-person instruction, the IEP team further reduced the expectations in Abigail's IEP goals due to her regression in the virtual setting, which further demonstrates her lack of progress.

54. The District's Superintendent testified that the District's School Board discussed whether to offer in-person instruction to the most at-risk special education students but decided not to do so.

55. The District's School Board received a detailed email from Parent with her concerns regarding Abigail's need for in-person instruction and the disparity in permitting in-person varsity sports while not providing necessary in-person education to her significantly disabled daughter. The District's Superintendent forwarded the email to the School Board before the January 27, 2021 school board meeting. The District's Superintendent testified "there was tremendous debate and discussion over sports returning," but she could not recall if special education was part of those discussions. The School Board allowed varsity sports to begin again on January 4, 2021. It did not bring back high-risk special education students until February 16, 2021 when it also brought back *all* elementary school students.

56. Many other school districts throughout Pennsylvania, during the same period, provided in-person instruction to some or all of their student populations, especially at-risk students with disabilities.

57. The District did not attempt to provide in-person instruction to Abigail, or her class of only five students, with safety precautions in place, including but not limited to social distancing, masking, plexiglass barriers, cohorting (grouping students together to ensure they only interact with the same few other students), frequent testing, or enhanced ventilation and cleaning protocols. Instead, it brought Abigail back to in-person instruction at the same time as its entire elementary school population.

58. At the end of the 2020-2021 school year, the District offered Abigail COVID-19 Compensatory Services only for related services (speech, occupational therapy, and physical therapy) and not for special education. COVID-19 Compensatory Services are services described in non-binding guidance from the Pennsylvania Department of Education based on a student's regression due to the absence of in-person instruction. *See* https://www.education.pa.gov/K-12/Special%20Education/FAQContact/Pages/COVID-19-Compensatory-Services.aspx. The services the District offered would take place for an hour and a half each day of Extended School Year ("ESY") following the ESY day. The District's Director of Special Education did not testify about how many hours of COVID-19 Compensatory Services were offered to Abigail. Parent had already made plans for Abigail to attend a summer camp for students with disabilities and Abigail did not attend the District's ESY. The offered hours did not help Abigail make up for lost time.

59. The District witnesses specifically testified that the decisions relating to implementing virtual instruction were based on *guidance*, not mandates, from the Pennsylvania Departments of Education and Health. The witnesses testified that virtual instruction was a choice.

60. Moreover, the District's Superintendent testified that, even after the Department of Education amended its guidelines to recommend the return of elementary and at-risk populations as of February 1, 2021, the District did not choose to do so until February 16, 2021.

## VII. Statutory Authority

61. The purpose of the IDEA is "to ensure that all children with disabilities have available to them a [FAPE]," 20 U.S.C. § 1400(d)(1)(A); *see also Endrew F. v. Douglas County School Dist*. RE-1, 137 S. Ct. 988 (2017); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982). A FAPE must also be provided "under public supervision and direction, ... meet the standards of the State educational agency, ... include an appropriate preschool, elementary school, or secondary school education in the State involved … [and must be provided at] no cost to Parents." *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 127 S. Ct. 1994, 2001 (citing 20 U.S.C. § 1401(9) and (29)). The mechanism for providing a FAPE is the IEP. *See* 20 U.S.C. § 1412(4).

62. The term "free appropriate public education" means special education and related services that "are provided in conformity with the individualized education program required under section 1414(d) of [the IDEA]." 20 U.S.C. § 1401(9)(D); 34 C.F.R. § 300.323.

63. The United States Supreme Court, in *Endrew F.*, recently clarified and expanded upon the standard initially set out in *Rowley* for determining whether a student's program is appropriate and explained that IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 1001 (citation omitted). While declining to adopt a "bright-line" regarding the appropriateness of an IEP, the Court made clear that an IEP must be judged under the child's factual circumstances, and that the program must be appropriately ambitious in light of the child's potential. *Id*.

64. An IEP must confer "significant learning" and "meaningful benefit" to the child. *See Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-185 (3d Cir. 1988). This Third Circuit test is fully in accord with *Endrew F.*'s standards. *See K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018).

65. It is also abundantly well-settled that "education" under IDEA extends beyond discrete academic skills, and includes the social, emotional, and physical progress necessary to provide the child with meaningful educational benefit toward levels of independence and self-sufficiency consistent with the child's cognitive potential. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 247 (3d Cir. 1999); *M.C. v. Central Regional School Dist.*, 81 F.3d 389, 393-394 (3d Cir. 1996). Thus, for an IEP to be appropriate, it must offer a child the opportunity to make progress which is "meaningful" in all relevant domains under the IDEA, including behavioral, social, and emotional. *S.H. v. State-Operated School Dist. of the City of Newark*, 336 F.3d 260, 265 (3d Cir. 2003).

66. At a minimum, an IEP must include a statement of the child's present levels of academic and functional performance, a statement of measurable annual goals designed to meet the child's needs to enable him or her to be involved in and make progress in the general education curriculum, a statement of how progress on the goals will be measured, and a statement of the special education and related services and supplementary aids and services, based upon peer-reviewed research, to be provided to the child. 34 C.F.R. § 300.320.

67. To the maximum extent appropriate, children with disabilities, including those in public or private institutions or other care facilities, must be educated with children who are not disabled. Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment should occur only when the nature or severity of the disability

of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412(a)(5)(A); *see T.R. v. Kingwood Township Board of Education*, 205 F.3d 572, 578 (3d Cir. 2000); *Oberti v. Board of Education of Clementon School District*, 995 F.2d 1204, 1215 (3d Cir. 1993).

68. "To prevail on a claim that a school district failed to implement an IEP, a plaintiff must show that the school failed to implement substantial or significant provisions of the IEP, as opposed to a mere *de minimis* failure, such that the disabled child was denied a meaningful educational benefit." *Melissa S. v. Sch. Dist. of Pittsburgh*, 183 Fed.Appx. 184, 187 (3d Cir. 2006) (citing *Houston Indep. Sch. Dist. v. Bobby R.,* 200 F.3d 341, 349 (5th Cir. 2000)); *see also Vicky M. v. Ne. Educ. Intermediate Unit*, 689 F.Supp.2d 721, 735 (M.D. Pa. 2009).

69. Section 504 provides additional protection for children with disabilities by prohibiting discrimination against handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C. § 794; 34 C.F.R. § 104.1 *et seq*.

70. Under Section 504, a "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3. The term "physical or mental impairment" is defined as "any physical or psychological disorder such as . . . emotional or mental illness and specific learning disabilities." *Id.* The term "major life activities" is defined as "functions such as caring for one's self . . . learning, and working." *Id.*

71. Under Section 504, recipients of federal funds are required to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The

term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

72. If a child is identified by a school district under IDEA, *and* the provisions of that Act are fulfilled, the school district's responsibilities under Section 504 are also fulfilled. However, where a school district fails to conform to IDEA, or where a child is eligible under Section 504 but not IDEA, a school district must provide the services and protections required by Section 504. 34 C.F.R. § 104.32 - 36 *et seq.*; *Ridgewood*, 172 F.3d at 253; *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995).

73. A violation of Section 504 need not be based upon overt "discrimination" based upon some obvious disparate treatment of a disabled child, but rather any denial of educational benefits is itself sufficient to establish a violation of Section 504. Along these lines, the courts have held that any denial of FAPE is itself a violation of Section 504, without finding some form of overt discrimination. *Andrew M. v. Delaware Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

74. A student with a disability who is otherwise qualified to participate in a school program and was denied the benefits of the program or otherwise discriminated against based on disability, has been subject to disability discrimination in violation of Section 504 protections. 34 C.F.R. § 104.4; *S.H. v. Lower Merion Sch. Dist.*, 729 F. 3d 248 (3d Cir. 2013). A student who claims discrimination in violation of the obligations of Section 504 must show deliberate indifference on the part of the school district in its purported acts/omissions. *Id.*

15

75. The IDEA and Section 504 provide that a party aggrieved has the right to bring a civil action in federal district court, which conducts an independent review of the administrative record and any additional evidence presented by the parties. 20 U.S.C. § 1415(i)(2); *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 527 (3d Cir. 1995). Moreover, both Section 504 and the IDEA permit recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415(i)(3)(B); 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

76. When a District fails to provide FAPE under both the IDEA and Section 504, it is well-settled that compensatory education is an available remedy for the student. *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990); *Ridgewood*, 172 F.3d at 250 n.11. Compensatory education is an in-kind remedy designed to provide eligible students with the services they should have received pursuant to a FAPE. *Lester H.*, 916 F.2d at 873 (holding that an award of compensatory education merely compensated the student for an inappropriate placement, belatedly allowing student to receive the remainder of his FAPE). The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. *M.C.*, 81 F.3d at 397.

77. In a question and answer dated September 28, 2020 relating to the delivery of special education during the COVID-19 pandemic, the United States Department of Education unequivocally stated, "that no matter what primary instructional delivery approach is chosen, . . . [Local Educational Agencies], and individualized education program (IEP) Teams remain responsible for ensuring that a free appropriate public education (FAPE) is provided to all children with disabilities." *See* https://sites.ed.gov/idea/files/qa-provision-of-services-idea-part-b-09-28-2020.pdf.

**VIII.  Hearing Officer Errors**

16

78. The Hearing Officer erroneously determined that there was no deprivation of FAPE from November 24, 2020 to February 16, 2021 or on the four additional days of virtual instruction despite Abigail's inappropriate programming; inability to participate in the virtual program due to behaviors and her disability-related deficits in attention, fine motor control, and behavior regulation; and her lack of meaningful progress.

79. The Hearing Officer erred in finding that Abigail made progress. As the District testified, she regressed behaviorally during virtual instruction, engaging in substantial self-injurious behaviors. She made inconsistent progress on some goals and failed to make any progress on others. In addition, as the District acknowledged at the hearing, the District did not appropriately monitor her progress due to the limitations of virtual instruction.

80. The Hearing Officer erred in finding that a statement that the Student enjoys using an iPad demonstrated that she received a FAPE while out of school.

81. The Hearing Officer erred in finding that the IEP revisions that watered-down Abigail's IEP were appropriate and timely in the circumstances. As the District acknowledged at the hearing, Abigail received reduced services and her goals were inappropriately lessened to accommodate not her individualized needs, but the virtual platform generally.

82. Moreover, the Hearing Officer's decision is grievously incorrect in finding that virtual instruction was mandatory. The Decision states:

> It is important to note that the virtual instruction which is contested by the parent in this case took place during a deadly public health crisis. As a result of the ongoing COVID19 pandemic, the state government issued mandates restricting the availability of in-person instruction.

(Decision at 14). This is legally incorrect and the evidence presented at the hearing clearly showed that the choice to implement virtual instruction was based on non-binding *guidance*.

17

83. Furthermore, there was clear error in discrediting the Parent's testimony on the issue of the appropriateness of virtual instruction and the provision of FAPE based on the conflicting testimony about the provision of nursing services, a fact not even remotely at issue in the hearing. The Hearing Officer clearly erred by affording more weight to all of the District's witnesses based on Parent's statements about her understanding of the financing of Abigail's nurse. Parent's testimony about Abigail's struggles during virtual instruction was corroborated by District witnesses and non-testimonial evidence. The District's Director of Special Education specifically testified that Abigail needs in-person instruction.

84. The Hearing Officer clearly erred in finding that Parent's Due Process Complaint did not raise discrimination based on the District's decision to permit in-person athletic practice and competition but deny Abigail the in-person instruction she needs. The Hearing Officer wrongly determined that there was no mention of extracurriculars in the Due Process Complaint. The Due Process Complaint specifically mentions in-person athletics during the period of virtual instruction. The Due Process Complaint specifically alleges violations of Section 504. The Hearing Officer's determination that the Section 504 discrimination issue was not appropriately before him is wrong.

85. Finally, the Hearing Officer erred when he determined that – were he to consider the Section 504 discrimination issues – Parent had not presented evidence of discrimination. Parent presented evidence that the District was aware of the impact of virtual education on Abigail due to her disabilities. Despite this knowledge, the District chose, with deliberate indifference, to allow in-person athletics, but deny in-person education to Abigail.

86. The IDEA requires an independent review of the administrative Decision and permits this Court to grant the relief sought by Plaintiff, since the statute expressly endows courts

with broad authority to grant "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B); 34 C.F.R. § 300.516(c)(3). The IDEA further provides federal courts hearing such matters "shall hear additional evidence at the request of a party." 20 U.S.C. 1415(i)(2)(C)(ii).

87. Plaintiff expects to be the prevailing party in this proceeding and is therefore entitled to an award of statutory attorneys' fees and costs for the present proceeding.

## IX. Conclusion

WHEREFORE, the Plaintiff respectfully requests that this Court:

1. Assume jurisdiction over this action;

2. Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3. Reverse the Hearing Officer's Decision to the extent it fails to Order the District to provide the requested relief, and reverse the Hearing Officer's ruling dismissing claims based on the Hearing Officer's incorrect finding that such claims were not in the Due Process Complaint;

4. Order the District to pay appropriate compensatory education for the period of November 24, 2020 to February 16, 2021 and March 12, 2021, March 19, 2021, April 26, 2021, and April 27, 2021;

5. Order the Defendant to pay Plaintiff reasonable attorneys' fees and related costs;

6. Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, and Pennsylvania law and to constitute discrimination on the basis of disability pursuant to Section 504; and

7. Grant such other relief as this Court deems proper.

Respectfully submitted,

/s/ Michael J. Connolly
Michael J. Connolly, Esquire
PA ID No. 82065

/s/ Heather M. Hulse
Heather M. Hulse, Esquire
PA ID No. 164134

/s/ Dennis C. McAndrews
Dennis C. McAndrews, Esquire
PA ID No. 28012

McANDREWS, MEHALICK, CONNOLLY, HULSE & RYAN, P.C.
30 Cassatt Avenue
Berwyn, PA 19312
(610) 648-9300 (phone)
(610) 648-0433 (fax)

Attorneys for Plaintiff