# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

ABIGAIL, P., through her Parent, Sarah F.,

        Plaintiff,

     v.

OLD FORGE SCHOOL DISTRICT,

        Defendants.

CIVIL ACTION NO. 3:21-CV-02033

(MEHALCHICK, M.J.)

## MEMORANDUM

Presently before the Court are cross-motions for judgment on the administrative record filed by Plaintiff Abigail P. ("Abby"), through her parent, Sarah F. ("Plaintiff") and Defendant Old Forge School District (the "District"). (Doc. 20; Doc. 25). On December 5, 2021, Plaintiff initiated this action by filing a complaint against the District under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act ("Section 504"), and Chapters 14 and 15 of the Pennsylvania Code. (Doc. 1). On February 9, 2022, the parties consented to proceed before the undersigned United States Magistrate Judge pursuant to Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). (Doc. 8). For the following reasons, Plaintiff's motion for judgment on the administrative record will be DENIED (Doc. 20), and the District's motion for judgment on the administrative record will be GRANTED (Doc. 25).

## I.    BACKGROUND AND PROCEDURAL HISTORY

Before the proceedings underlying this appeal, Plaintiff filed a due process complaint with the Pennsylvania Department of Education on May 4, 2021, requesting a special education due process hearing under the IDEA, Section 504, and Chapters 14 and 15 of the Pennsylvania Code. (Doc. 7-10, at 1). Plaintiff avers that the District intentionally

discriminated against Abby and failed to provide her with a free and appropriate public education ("FAPE") during the 2020-2021 school year. (Doc. 7-10, at 1-4). An administrative hearing officer, James Gerl (the "Hearing Officer"), held a one-day due process hearing on July 9, 2021, where four witnesses provided testimony. (Doc. 7-6). On September 7, 2021, the Hearing Officer issued a decision in favor of the District, holding that the District provided Abby a FAPE and merely followed guidance from the Pennsylvania Department of Health, which recommended virtual instruction to curb the rise of COVID-19. (Doc. 7-3, at 1-18).

On December 5, 2021, Plaintiff filed the instant civil action to appeal the Hearing Officer's September 7, 2021, decision. (Doc. 1). The Office of Dispute Resolution filed a certified copy of the administrative record in *A.P. v. Old Forge School Dist.,* ODR File No. 24658/20-21, on January 27, 2022. (Doc. 7). On February 10, 2022, the District filed an answer to the complaint. (Doc. 9). On May 23, 2022, Plaintiff filed a motion for judgment on the administrative record, as well as a brief in support on May 24, 2022, requesting that the Court reverse the Hearing Officer's decision, find that the District denied Abby a FAPE, and award compensatory education, attorney's fees, costs, and any other relief that the Court deems necessary.[1] (Doc. 20; Doc. 21, at 2). On July 15, 2022, the District filed a cross-motion for judgment on the administrative record, as well as a brief in support, requesting that the Court affirm the Hearing Officer's decision. (Doc. 25; Doc. 26, at 8). Plaintiff filed a reply

---

[1] Plaintiff has chosen to forego their intentional discrimination claim under Section 504. (Doc. 21, at 8). Plaintiff explains that "[w]hile the District's decision to refuse in-person instruction to its most vulnerable children while permitting indoor basketball to their non-disabled peers is blatantly intentional discrimination, the connection between the denial of any education benefit during virtual instruction and the denial of a FAPE is inescapable." (Doc. 21, at 8). Therefore, Plaintiff's remaining claims in this action is the District's denial of a FAPE under the IDEA, Section 504, and the Americans with Disabilities Act ("ADA"). (Doc. 21, at 8).

brief on July 28, 2022, and the District filed a reply brief on August 11, 2022. (Doc. 27; Doc. 28). The parties engaged in oral argument before the Court on August 29, 2022. (Doc. 13).

The facts relevant to the parties' cross-motions are taken from the administrative record on appeal and the parities' pleadings, and are summarized as follows. (Doc. 7; Doc. 21; Doc. 26; Doc. 27; Doc. 28).

A. BACKGROUND

Abby's date of birth is October 27, 2011, and she has severe disabilities including moderate to severe autism spectrum behavior, intellectual disability, cognitive-communication disorder, speech sound disorder, a history of global development delays, and epilepsy. (Doc. 1, ¶ 2; Doc. 7-3, at 4, Doc. 21, at 6). Abby is non-verbal, relies on a communication device, functions cognitively in the less than 0.1 percentile of her same-aged peers at an age equivalence of a two- to three-year-old, and needs constant redirection to tasks. (Doc. 1, ¶ 2; Doc. 7-8, at 13). Socially and emotionally, Abby displays aggression, self-injurious behaviors, atypical behaviors, perseverative and repetitive actions, restricted interests, inattention, impulsivity, restlessness, anxiety, low frustration tolerance, withdrawal, lack of social cognition and awareness, reduced social motivation, avoidance and lack of compliance, and reduced self-monitoring/coping skills. (Doc. 1, ¶ 30).

Before the COVID-19 pandemic, Abby received in-person instruction from 8:25 am to 2:30 pm every day with four other students in an autistic support classroom operated by the Intermediate Unit. (Doc. 7-6, Admin. Tr. 170:2-171:21, July 9, 2021). The students would have breakfast and circle time in the morning, followed by individual one-on-one reading instruction, then lunch, and finally one-on-one math instruction. (Doc. 7-6, Admin. Tr. 170:2-

25, July 9, 2021). In addition, Abby received physical therapy sessions for one thirty (30) minute individual weekly session. (Doc. 7-8, at 166).

An independent neuropsychological evaluation of Abby was conducted on January 3 and February 3, 2020. (Doc. 7-8, at 6). A report of that evaluation was issued on March 10, 2020, making various recommendations based on Abby's developmental history, evaluation observations, and school observations. (Doc. 7-8, at 6-12). The report explains that during her assessment, "Abby exhibited significant weaknesses and delays across neurocognitive domains, including general intellectual functions, expressive language skills, language comprehension, visuospatial analysis, nonverbal pattern analysis, and attention/executive control." (Doc. 7-8, at 17). The report notes: "Although Abby is struggling with cognitive/developmental disabilities, she is capable of developing and learning, albeit at an individualized pace in comparison to her typical age and grade peers. She does well and has a preference for learning on devices/iPads." (Doc. 7-8, at 17).

An independent educational speech and language evaluation ("IEE") of Abby was conducted on November 8, 2019, and a report of that evaluation was issued on March 20, 2020. (Doc. 7-8, at 32). Setting forth document reviews, clinical observations, and clinical impressions, the IEE makes recommendations regarding Abby's academic experience and the goals that could be employed. (Doc. 7-8, at 49-50). The IEE "recommended that [Abby]'s academic experience be provided by a staff that is fully versed in all areas of [Abby]'s deficits." (Doc. 7-8, at 47). Specifically, the IEE noted that Abby "readily and consistently responded to sounds associated to her preferred task on the iPad," and that an iPad may be beneficial as a developmental-pragmatic approach to encourage the development of multiple aspects of communication. (Doc. 7-8, at 41, 49).

The District began providing virtual instruction on November 25, 2020, and was closed for the Thanksgiving holiday from November 26 through November 30, 2020. (Doc. 7-3, at 5). The District resumed virtual instruction from December 1 through December 23, 2020, and was closed for the Christmas holiday from December 24, 2020, though January 3, 2021. (Doc. 7-3, at 5). The District resumed virtual instruction from January 4 through February 16, 2021, with the exception of the Martin Luther King holiday. (Doc. 7-3, at 5). On February 16, 2021, the District resumed in-person instruction, but provided virtual instruction on March 12, March 19, and April 26 through 27, 2021, due to the number of positive COVID-19 cases and the cleaning directives of the Department of Health. (Doc. 7-3, at 5).

During the COVID-19 pandemic, Abby received a slight decrease in her one-on-one instruction sessions and matching Velcro activities, dry-erase markers, and letters and numbers so that Abby could practice. (Doc. 7-6, Admin. Tr. 171:25-172:21, July 9, 2021). Abby's teacher used the same materials and methodology for math and reading that were used during in-person instruction. (Doc. 7-6, Admin. Tr. 171:25-172:21, July 9, 2021). During Abby's virtual learning sessions, she used an iPad and a nurse and behavioral assistance, who was paid for by the District, were present. (Doc. 7-6, Admin. Tr. 171:25-172:21, July 9, 2021).

On May 28, 2020, the District developed an independent educational plan ("IEP") for Abby. (Doc. 7-8, at 53). The IEP was in effect from May 28, 2020, until December 22, 2020, and includes goals for number and letter matching, a social/emotional goal, and two behavior goals. (Doc. 7-8, at 79-95). During the virtual instruction, Abby received three thirty-minute individual speech sessions per week, three thirty-minute individual occupational therapy sessions per week, and one thirty-minute individual physical therapy session per week. (Doc.

7-8, at 58). She also received behavior tech services and BCBA services provided by Beyond

Behavior Consulting as well as a licensed practical nurse in the event medication needs to be

given. (Doc. 7-8, at 58). In setting measurable annual goals, the IEP noted that "[d]ue to the

extended closure of schools as a result of the COVID-19 pandemic, a baseline is not available

at this time." (Doc. 7-8, at 79-87). The IEP provides for related services of speech/language

therapy, occupational therapy, physical therapy, and adaptive physical education, as well as

the following modifications and specially designed instruction to be provided on a daily

frequency: visual schedule, use of proximity to reduce aggressive behaviors,

reinforcement/prompting of alternative behavior, continue the use of applied behavioral

analysis, prompt hierarchy, structured routine, clear expectations, visual prompts, modeling,

first/then token economy, manipulatives, edible reinforcement, timers, boom learning,

TOCA doctor, and aided language output to include, but not limited to, communication

boards, communication voice output device, isolated icons, and picture cards. (Doc. 7-8, at

99-103). The IEP explained that Abby would participate in a center-based full-time Autistic

Support classroom to the end of the 2019-2020 school year, and then she would transition to

a full-time school-based Autistic Support classroom run by NEIU-19 housed within Old Forge

Elementary School, where she would have opportunities to interact with non-disabled peers.

(Doc. 7-8, at 108).

On December 22, 2020, Abby's IEP was amended to reflect virtual instruction. (Doc.

7-8, at 112). Specifically, the amended IEP sections were present levels, specially designated

instruction, and goals. (Doc. 7-8, at 113). The revision explained that "[d]uring remote

learning due to Covid-19, considerations for documenting attendance based on work

completion as well as adjustments to locations of supports for the remote/virtual learning

environment." (Doc. 7-8, at 118). The amended IEP provided Abby with five Zoom sessions a week with optional Google classroom assignments four days a week that provide enrichment and extra practice. (Doc. 7-8, at 118). In addition, the amended IEP states that "[d]ue to a conflict in scheduling of group social morning activities and occupational therapy, Abby's mother has opted to have her participate in circle instead of OT two days a week." (Doc. 7-8, at 118).

From January 4, 2021, the District allowed its varsity basketball team to resume in-person practice while the District continued to provide virtual instruction. (Doc. 7-3, at 7-8). On January 8, 2021, the USDOE amended guidelines stating that virtual instruction should continue during substantial transmission, but otherwise allowed school districts to bring elementary and at-risk populations back as of February 1, 2021. (Doc. 7-3, at 8-9). On January 27, 2021, the District held a meeting where it decided to extend virtual instruction by two weeks with a return to in-person instruction date of February 16, 2021, due to the community's high positive transmission. (Doc. 7-3, at 9). On February 16, 2021, the District returned to in-person instruction. (Doc. 7-3, at 9).

B. THE DUE PROCESS HEARING

On March 4, 2021, Plaintiff filed an Administrative Due Process complaint seeking compensatory education arising from the District's failure to provide Abby with an appropriate program under the IDEA and Section 504 from November 24, 2020, until February 16, 2021. (Doc. 1, ¶ 6). On July 9, 2021, the Hearing Officer conducted an administrative hearing where four witnesses provided testimony: Dr. Erin Keating, the District's Superintendent (Doc. 7-8, Admin. Tr. 23, July 9, 2021); Michelle Hopkins, the District's Director of Special Education (Doc. 7-8, Admin. Tr. 75, July 9, 2021); Sarah

Friedman, Plaintiff/Abby's mother (Doc. 7-8, Admin. Tr. 126, July 9, 2019); and Kathryn McLane, Abby's special education teacher (Doc. 7-8, Admin. Tr. 168, July 9, 2019).

In the decision dated September 7, 2021, the Hearing Officer denied all relief requested in Plaintiff's due process complaint. (Doc. 7-3, at 18). The Hearing Officer found that Plaintiff has not alleged an actionable procedural violation or shown that Abby's IEP was not appropriate. (Doc. 7-3, at 12). First, the Hearing Officer noted that "[a]t the time they were written, [Abby]'s IEPs were clearly designed to meet [Abby]'s needs," as the IEP adopted many of the recommendations contained in the independent educational evaluation of Abby, included academic goals and goals to address Abby's behavioral and social/emotional needs, included appropriate specially designed instruction and modifications, and provided the related services of speech/language, physical therapy, occupational therapy, and adaptive physical education. (Doc. 7-3, at 12). Moreover, the Hearing Officer found that Abby "did in fact make progress under [Abby]'s IEPs, including during virtual instruction." (Doc. 7-3, at 12).

Next, the Hearing Officer found that Plaintiff has not proven that the District denied a FAPE to Abby. (Doc. 7-3, at 13). The Hearing Officer opined that "[t]o the extent that the testimony of the parent conflicts with the testimony of the school district staff," "the testimony of the parent is less credible and persuasive than the testimony of school district staff because the demeanor of the witnesses," and because the parent's false testimony that she paid for Abby's nurse who was present during virtual instruction, when the District's documentary evidence established that it had in fact paid for the nursing services for Abby. (Doc. 7-3, at 12-13). Further, the Hearing Officer rejected Plaintiff's argument that virtual instruction is *per se* a violation of IDEA. (Doc. 7-3, at 14).

8

Concerning the period from November 24, 2020, through February 16, 2020, the Hearing Officer opined that the record evidence reveals that virtual instruction was appropriate for Abby. (Doc. 7-3, at 14). The Hearing Officer explained that Abby received related services successfully through virtual instruction and that "the recommendations of the evaluator who conducted the independent educational evaluation for [Abby] included a conclusion that [Abby] '. . . does well and has a preference for learning on devices/iPads,'" which Abby's teacher later confirmed. (Doc. 7-3, at 14-15). Further, the Hearing Officer noted that Abby's special education teacher, Kathryn McLane, "testified that although virtual instruction presents a number of challenges, the teacher was able to provide instruction to [Abby] virtually." (Doc. 7-3, at 15). The Hearing Officer highlighted:

> It is important to note that the virtual instruction which is contested by the parent in this case took place during a deadly public health crisis. As a result of the ongoing COVID-19 pandemic, the state government issued mandates restricting the availability of in-person instruction. In this context, it is clear that the school district had to be concerned with the health and safety of not only this student but also other students and parents and teachers and staff.

(Doc. 7-3, at 15).

In sum, the Hearing Officer concluded that Plaintiff has not proven that the District denied a FAPE to Abby. (Doc. 7-3, at 16). Accordingly, the Hearing Officer denied all relief requested in Plaintiff's due process complaint.[2] (Doc. 7-3, at 18).

---

[2] In the Hearing Officer's decision, he also discussed Plaintiff's discrimination claim under Section 504. (Doc. 7-3, at 16-17). However, Plaintiff agreed to abandon the discrimination claim on appeal, so the Court declines to address this portion of the Hearing Officer's decision.

## II.   LEGAL STANDARD

### A.  THE IDEA

The IDEA's purpose is to require states to "make available a free and appropriate public education to all children with disabilities residing within [the state's] borders." *D.S. v. Bayonne Bd. Of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010). This requirement is enforced through contingent federal funding to State Educational Agencies ("SEAs") and Local Educational Agencies ("LEAs"), where eligibility for funding is conditioned upon submission of a plan demonstrating that the state complies with the IDEA. *See* 20 U.S.C. §§ 1412, 1413. Thus, the IDEA strikes a bargain where, in return for federal government funds to educate students with disabilities, a state must comply with the IDEA. Here, it is undisputed that the District is an LEA receiving federal funding and that it is bound to comply with the IDEA. (Doc. 7-8, at 53).

The central premise of the IDEA is to provide a free and appropriate public education—a FAPE, for short—to every eligible disabled student. What constitutes a FAPE, however, depends upon the needs of each child. The statutory definition of a FAPE includes "special education," or a specifically designed instruction to meet the child's unique needs, and "related services," or support services required to help the child benefit from such instruction. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (citing §§ 1401(26), (29)). To implement these statutory requirements, a state must provide each child with an individualized education program (" IEP"), which is "the means by which special education and related services are tailored to the unique needs of a particular child." *Endrew F.*, 137 S. Ct. at 994 (internal quotation marks omitted); *see also* §§ 1412(a)(4), 1414(d).

A sufficient IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001. The IEP is "the centerpiece of the [IDEA]'s education delivery system for disabled children," and it must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *See Endrew F.*, 137 S. Ct. at 996 (internal citations omitted). That is, an IEP must be crafted such that the child may "achieve passing marks and advance from grade to grade." *Endrew F.*, 137 S. Ct. at 999 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 203-04 (1982)) (internal quotation marks omitted). The IEP must provide the student with a "basic floor of opportunity," but need not rise to the level of providing the student with "the optimal level of services" or grant all of the parents' requests. *D.S.*, 602 F.3d at 557. Each IEP is required to include: (1) present levels of academic achievement and functional performance; (2) a statement of measurable annual goals; (3) how the child's progress toward meeting the annual goals is to be measured; and (4) special education and supplementary aids and services, as well as other details regarding how the IEP will be implemented. *See* 20 U.S.C. § 1414(d)(1)(A)(i); *see also N.H. by & Through S.H. v. Phoenixville Area Sch. Dist.*, No. CV 21-1066, 2021 WL 5998445, at *1 (E.D. Pa. Dec. 20, 2021).

An LEA, such as the District, is tasked with developing the IEP. This process typically involves the child's parents and school personnel working together to identify the child's needs and to develop a plan to achieve educational goals. As noted by the Supreme Court, "parents play[ ] 'a significant role' in this process." *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007). A child's IEP "should evolve with the child's development, and should be continually revised as appropriate." *Charlene R. v. Solomon Charter Sch.*, 63 F. Supp.

3d 510, 513 (E.D. Pa. 2014) (citing 20 U.S.C. § 1414(d)(4)). Thus, assessing the content and implementation of a child's IEP is crucial to the determination of whether a child was provided—or denied—a FAPE.

Once an IEP is finalized, a parent may accept or reject it. If the parents reject the IEP as failing to provide a FAPE, the parents may secure additional educational services, including placement in a private school, and next request a Due Process Hearing before a state Administrative Law Judge. *See* 20 U.S.C. § 1412(a)(1)(C)(iii); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)). At a Due Process Hearing, the parents bear the burden of proving by a preponderance of the evidence that the student cannot receive FAPE without the accommodations requested by the parents. The ALJ hears the testimony of lay and expert witnesses, receives documentary evidence, and ultimately issues a written decision with findings of fact and conclusions of law. 34 C.F.R. § 300.512(a)(5). Either party may challenge the ALJ's final decision by filing suit in a district court of the United States or the appropriate state court. 20 U.S.C. § 1415(i)(2).

For a district court to have subject matter jurisdiction over a claim pursuant to the IDEA, a claimant must first exhaust the administrative remedies available under the statute. *See Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014) (citing *Komninos by Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994)). This requirement "encourage[es] parents and the local school district to work together to formulate an IEP for a child's education." *Batchelor*, 759 F.3d at 275. Administrative remedies under the statute involve filing a complaint with the child's LEA, and corresponding SEA, and participating in a Due Process Hearing. *Bachelor*, 759 F.3d at 272; *see also* 20 U.S.C. §§ 1415(a), (b)(6)(A), (f)(1)(A). "Upon receipt of a proper due process complaint, the SEA assigns the matter to a

special education hearing officer who schedules a due process hearing." *T.L. by & through Latisha G. v. Pennsylvania Leadership Charter Sch.*, 224 F.Supp.3d 421, 425 (E.D. Pa. 2016). At the close of the due process hearing, the hearing officer will enter a decision. If either the child's parents or the LEA are dissatisfied with the decision, they "have the right to bring a civil action with respect to the [due process] complaint . . . in a State court of competent jurisdiction or in a district court of the United States," as Plaintiff has done in this case. *See Latisha G. v. Pennsylvania Leadership Charter Sch.*, 244 F.Supp.3d 421, 425 (E.D. Pa. 2016).

Among the remedies available under the IDEA are compensatory education and tuition reimbursement. Compensatory education is an equitable remedy in which a child is given additional education hours to make up for deficient hours of schooling when not provided a FAPE. *See Ferren C. v. School Dis. Of Philadelphia*, 612 F.3d 712, 717 (3d Cir. 2010). "A court award of compensatory education requires a school district to provide education past a child's twenty-first birthday to make up for any earlier deprivation." *M.C. on Behalf of J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 395 (3d Cir. 1996).

B. STANDARD OF REVIEW

Under the IDEA, "[any] party aggrieved by the findings and decision" of the state administrative hearing examiner may bring suit in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In reviewing the complaint, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

13

The standard for federal review of a state hearing officer's decision is "modified *de novo*," which is a "nontraditional standard of review." *D.S.*, 602 F.3d at 564 (citations omitted). The court exercises plenary review over the hearing officer's legal conclusions, *Colonial Sch. Dist. v. G.K. ex rel. A.K.*, No. 17-3377, 2018 WL 2010915, at *2 (E.D. Pa. Apr. 30, 2018), *aff'd*, 764 F. App'x 192 (3d Cir. 2019), but must give "due weight" to the hearing officer's factual findings. *S.H. v. State-Operated School District of the City of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). The United States Supreme Court has construed 20 U.S.C. § 1415(i)(2)(C) to require that district courts give "due weight" to the administrative proceedings, while being careful to avoid replacing its "own notion[ ] of sound educational policy for those of the school authorities [that] they review." *Rowley*, 458 U.S. at 206. A hearing officer's findings of facts from the administrative proceedings "are to be considered *prima facie* correct." *Ridley Sch. Dist.*, 680 F.3d at 268 (citations omitted).

In turn, however, if a reviewing court chooses to stray from any of the facts found by the hearing officer, the court "is obligated to explain why." *S.H.*, 336 F.3d at 270 (quoting *MM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 531 (4th Cir. 2002)). Taking these standards into account, "a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate." *D.S.,* 602 F.3d at 564; *see also Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (describing a district court's burden as "unusual" in that it must make its own findings by a preponderance of the evidence, but nevertheless afford "due weight" to the administrative officer's determinations). The Court will apply the modified de novo standard of review to Plaintiff's claims under the IDEA, Section 504, and the ADA. *Stephen O. v. Sch. Dist. of Philadelphia*, No. CV 20-1991, 2021 WL 6136217, at *11 (E.D. Pa. Dec. 29, 2021).

### III.   DISCUSSION

Plaintiff argues that the Court should reverse the Hearing Officer's decision for two reasons: (1) the Hearing Officer failed to apply the correct legal standard in assessing the IEP; and (2) the Hearing Officer erroneously concluded that the District provided Abby a FAPE. (Doc. 21, at 18-25). The Court considers both arguments in turn.

A.   Did the Hearing Officer erroneously relax the FAPE standard?

First, Plaintiff argues that the Hearing Officer erroneously relaxed the standard of providing a FAPE by referring to COVID-19 mitigation guidance from the Pennsylvania Department of Health, and ignoring "Congressional mandates, Supreme Court holdings, and the specific direction from the United States Department of Education ("USDOE") that school districts must continue to provide FAPE to children with disabilities during the pandemic." (Doc. 21, at 18). Plaintiff contends that "[h]ad the Hearing Officer enforced the District's obligation to provide a FAPE, then [Plaintiff] would have prevailed." (Doc. 21, at 18). Conversely, the District argues the Hearing Officer applied the correct standard and that there is no basis to change any of the Hearing Officer's findings of fact, which are considered prima facie correct. (Doc. 26, at 9; Doc. 28, at 2). The District contends the evidence establishes that Abby made progress toward her goals and asserts that allowing varsity basketball to play "has nothing to do with whether [Abby] received FAPE." (Doc. 26, at 14-15).

An IEP is developed through collaboration between parents and school districts, and "must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the

school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *see Ridley Sch. Dist.*, 680 F.3d at 269.

As noted *supra*, the Hearing Officer's decisions regarding the application of legal standards and conclusions of law are subject to plenary review as conclusions of law. *See P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.,* 585 F.3d 727, 735 (3d Cir.2009). However, whether the District fulfilled its FAPE obligations is subject to clear error as questions of fact. *See P.P.*, 585 F.3d at 735. As the party challenging the administrative decision bears the burden of persuasion, Plaintiff bears the burden with regard to the amount of compensatory education awarded and the District bears the burden with regard to the remaining issues on appeal. *Ridley Sch. Dist.*, 680 F.3d at 270.

"The IDEA requires states receiving federal education funding to provide every disabled child with a [FAPE]." *Ridley*, 680 F.3d at 268. A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley,* 458 U.S. at 189. "The IDEA contemplates that school districts will achieve these goals by designing and administering a program of individualized instruction for each special education student set forth in an Individualized Education Plan ("IEP")." *D.S.,* 602 F.3d at 557. Thus, at the heart of every FAPE lies the IEP. *Endrew F,* 137 S. Ct. at 999 (citing *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). The IEP "consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *D.S.,* 602 F.3d at 557; *see* 20 U.S.C. § 1414(d)(1)(A). Particularly relevant to

the instant matter is the requirement that the IEP include "a statement of the special education and related services . . . to be provided to the child. 20 U.S.C. § 1414(d)(1)(A)(IV).

Plaintiff argues that the Court must reverse the Hearing Officer's decision because he failed to liberally construe IDEA in favor of the protected class of disabled children, and that the guidance from the Pennsylvania Department of Health consisted of recommendations, not mandates like those from Congress, the Supreme Court, and the United States Department of Education to provide a FAPE. (Doc. 20-1, at 19-20). Plaintiff states that rather than citing to guidance from the Pennsylvania Department of Health, the Hearing Officer erroneously cited to a District email referring to such guidance, which is unrelated to IDEA or the requirement to provide a FAPE. (Doc. 7-3, at 5; Doc. Doc. 7-8, at 177; Doc. 21, at 20). Plaintiff claims "the Hearing Officer essentially held that the pandemic relieved the District from providing a FAPE." (Doc. 21, at 20). Conversely, the District asserts that the Hearing Officer applied the correct FAPE standard by appropriately relying on the testimony of Keating, the District's Superintendent. (Doc. 26, at 2).

In March 2020, the USDOE issued interim help to school administrators to plan for the spread of COVID-19. In its Questions and Answers on Providing Services to Children with Disabilities during the Coronavirus Disease 2019 Outbreak, the Department stated: "[i]f a[ District] closes its schools to slow or stop the spread of COVID-19, and does not provide any educational services to the general student population, then [it] . . . would not be required to provide services to students with disabilities during that same period of time." U.S. Dep't of Educ., Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak (March 2020) at 2, https://sites.ed.gov/idea/files/qa-covid-19-03-12-2020.pdf ("USDOE Q&A"); *see Aja N. v.*

*Upper Merion Area Sch. Dist.*, No. CV 21-4234, 2022 WL 3371612, at *4 (E.D. Pa. Aug. 16, 2022); *see also Hernandez v. Grisham*, 508 F. Supp. 3d 893, 920 (D.N.M. 2020) (quoting the New Mexico Public Education Department's summary of the first UUSDOE guidance as: "if Schools do not provide any education services to the general student population during the school closure, then it would not be required to provide services to student with disabilities during the school closure." (quotation omitted)).

However, the USDOE clarified this guidance shortly after its issuance. On March 21, 2020, new guidance was issued to correct the "serious misunderstanding" that "federal disability law presents insurmountable barriers to remote education." U.S. Dep't of Educ., Supplemental Fact Sheet 1 (Mar. 21, 2020), https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/Supple%20 Fact%20Sheet%203.21.20%20FINAL.pdf ("USDOE Supplemental Fact Sheet"). The new guidance stated that "schools should not opt to close or decline to provide distance instruction, at the expense of students, to address matters pertaining to services for students with disabilities." USDOE Supplemental Fact Sheet at 1. It further clarified that: "[t]o be clear: ensuring compliance with the Individuals with [IDEA, Section 504, and the ADA] should not prevent any school from offering educational programs through distance instruction." USDOE Supplemental Fact Sheet at 1 (emphasis omitted). Overall, the guidance emphasized that, while the provision of a FAPE may be flexible during times of national crisis, nevertheless "[s]chool districts *must* provide a . . . [FAPE] consistent with the need to protect the health and safety of students with disabilities and those individuals providing education, specialized instruction, and related services to these students." USDOE Supplemental Fact Sheet at 1. Moreover, the USDOE expressly endorsed "special education

and related services provided through distance instruction provided virtually, online, or telephonically." USDOE Supplemental Fact Sheet at 1-2. Therefore, the USDOE required schools, to the greatest extent possible, to provide FAPEs to students with IEPs even during time periods of curtailed instruction during the COVID-19 pandemic.

Furthermore, even in times of emergency, the IDEA itself requires school districts to provide FAPEs to students with IEPs. In *Hernandez*, the United States District Court for the District of New Mexico weighed a school's argument that it need not provide in-person instruction during the COVID-19 pandemic. 508 F.Supp.3d at 920. The court observed: "the IDEA [does not] create any emergency exception excusing funding recipients from delivering a FAPE to students with disabilities . . . the IDEA requires funding recipients to provide children with disabilities with a FAPE, even if that means providing in-person learning during a pandemic." *Hernandez*, 508 F.Supp.3d at 1005 (citing 20 U.S.C. § 1401(9)); accord 34 C.F.R. § 300.101(a) ("A free appropriate public education *must* be available to all children residing in the State between the ages of 3 and 21, inclusive . . . ." (emphasis added)). Because neither the IDEA nor Department of Education guidance exempts schools from providing FAPEs to students with IEPs during the COVID-19 pandemic, the District was not exempted from delivering a FAPE to Abby. *See Aja N.*, 2022 WL 3371612, at *5.

In this case, the Hearing Officer found that the District did in fact provide Abby a FAPE and that Abby was able to learn through virtual instruction during the relevant period. The Hearing Officer opined that the District employed virtual instruction during the COVID-19 pandemic "because of guidance from the Pennsylvania Departments of Health and Education in light of unprecedented safety concerns with respect to substantial transmission

of COVID-19 in the surrounding area." (Doc. 7-3, at 5). Further, the Hearing Officer explained:

> It is important to note that the virtual instruction which is contested by the parent in this case took place during a deadly public health crisis. As a result of the ongoing COVID-19 pandemic, the state government issued mandates restricting the availability of in-person instruction. In this context, it is clear that the school district had to be concerned with the health and safety of not only this student but also other students and parents and teachers and staff.

(Doc. 7-3, at 15).

The Hearing Officer relied in part on an email from the District's Director of Special Education, Michelle Hopkins, which explains that decisions regarding virtual and in-person instruction "are guided by the Department of Health and PA Dept. of Educ. To ensure the best possible safety for all of our kids." (Doc. 7-8, at 177).

In addition, the Hearing Officer relied in part on the testimony of Erin Keating, the District's Superintendent. (Doc. 26, at 2). At the administrative hearing, Keating testified that she "believe[s] the best place for a child is in person," but due to the "unprecedented time" related to the COVID-19 pandemic, the District was operating under "guidance from the Department of Health and guidance from the Department of Education." (Doc. 7-6, Admin. Tr. 36:25-37:1-6). In addition, Keating testified that on November 25, 2020, the District was closed due to a positive COVID-19 case. (Doc. 7-6, Admin. Tr. 57:18-24). Keating stated "the district had to complete an attestation form saying that we would adhere to the guidelines or not adhere to the guidelines. We said we would adhere to the guidelines." (Doc. 7-6, Admin. Tr. 58:9-12). Keating explained "the guidelines at that point were to remain in – while in substantial transmission, you were to remain in virtual instruction until the county moved to lower moderate transmission for two consecutive weeks." (Doc. 7-6, Admin. Tr. 58:13-17). Keating noted that the United States Department of Health and Department of Education

amended the recommendations on January 8, 2021, directing the school districts "to keep everyone virtual during the substantial transmission, and . . . bring elementary and at risk populations back as of February 1." (Doc. 7-6, Admin. Tr. 58:23-25-59:1-5). Keating testified that on January 27, 2021, "the Board made the decision, instead of coming back on the 1st, to give it two more weeks to see if the numbers would come down and to return elementary and at risk populations on the 16th." (Doc. 7-6, Admin. Tr. 59:19-23). During that time. Keating clarified that all students were required to attend virtual instruction, including students with IEPs. (Doc. 7-6, Admin. Tr. 60:3-4).

Plaintiff argues that the IDEA is a minimum standard, which means that the Pennsylvania Department of Health "may not enact legislation that erodes IDEA's mandate that public school districts provide students with a FAPE. Moreover, the [USDOE] did not waive requirements that public school districts provide FAPE to students with disabilities during the pandemic." (Doc. 21, at 19) (citing *Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 781 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)). Plaintiff claims "the Hearing Officer essentially held that the pandemic relieved the District from providing a FAPE." (Doc. 21, at 20). However, there is no evidence in the record to suggest the Hearing Officer erroneously relaxed the standard of the IDEA as applied to Abby. Instead, the Court finds it is clear that, in the specific context of the COVID-19 pandemic, the USDOE embraced an approach of granting schools maximum flexibility to keep their students safe so long as they continue to offer all students a FAPE. *See generally* USDOE Q&A; USDOE Supplemental Fact Sheet; *see also J.T. v. de Blasio*, 500 F. Supp. 3d 137, 187 (S.D.N.Y. 2020). Moreover, the USDOE guidance explicitly states remote education is not a *per se* violation of IDEA. *See* USDOE Supplemental Fact Sheet at 1-2 ("the provision of FAPE may include, as appropriate, special

21

education and related services through distance instruction, provided virtually, online, or telephonically."); *see Carmona v. New Jersey Dep't of Educ.*, No. CV 21-18746, 2022 WL 1639195, at *4 (D.N.J. May 24, 2022). The Court may not substitute its own notions of sound educational policy for those of local school authorities. *Rowley*, 458 U.S. at 206. Accordingly, the Court finds that the Hearing Officer did not erroneously relax the standard of the IDEA.

B. DID THE HEARING OFFICER ERR IN CONCLUDING THAT ABBY RECEIVED A FAPE DURING VIRTUAL INSTRUCTION?

Plaintiff asserts that the Hearing Officer erred by concluding that Abby received a FAPE during her virtual instruction because Abby's teachers allegedly testified that she required in-person instruction, could not meaningfully participate in virtual education, did not receive all of her related services, and regressed academically and behaviorally due to virtual school. (Doc. 20-1, at 21). Plaintiff claims the "District's administrators knew that Abby was among the District's most at-risk learners and that she needed to be educated in person; however, the administrators could not recall the school board discussing her education even as it discussed and approved in-person basketball practice and games." (Doc. 20-1, at 24). Conversely, the District argues there has been no evidence presented to establish that the goals were not reasonably calculated to yield meaningful educational benefit to Abby. (Doc. 26, at 12). Furthermore, the District states there has been no evidence presented to establish that the student had needs in any areas other than those identified in the IEPs. (Doc. 26, at 12). In response, Plaintiff avers the Hearing Officer's findings are contradicted by non-testimonial evidence and that the findings are belied by the contrary statements of the witnesses upon which the Hearing Officer relied in reaching his conclusion. (Doc. 27, at 5).

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's

circumstances." *Endrew F.*, 137 S. Ct. at 999. But since progress for one student is different than progress for another student, the IEP must be "constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Endrew F.*, 137 S. Ct. at 999. Moreover, "it cannot be determined whether an IEP was appropriate solely by evaluating a child's progress or lack of progress under that IEP." *Colonial Sch. Dist.*, 2018 WL 2010915, at *11. Instead, "a court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made." *D.S.*, 602 F.3d at 564 (citing *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995)).

In addition, an "IEP need not aim for grade-level advancement" if such a goal "is not a reasonable prospect for a child." *Endrew F.*, 137 S. Ct. at 1000. Incremental progress can be considered meaningful, but a meaningful educational benefit must be more than *de minimis. See Endrew F.*, 137 S. Ct. at 1001. "[A]t a minimum, the IEP must be reasonably calculated to enable a child to receive meaningful educational benefits in light of the student's intellectual potential." *D.S.*, 602 F.3d at 557 (internal quotations omitted).

"Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 1000 (citing *Rowley*, 458 U.S. at 206–07). And "[t]he issue of whether an IEP is appropriate is a question of fact." *D.S.*, 602 F.3d at 564 (quoting *S.H.*, 336 F.3d at 271). Thus, the modified *de novo* standard applies and the Court will give due weight to the Hearing Officer's findings. *See D.S.*, 602 F.3d at 564 (quoting *S.H.*, 336 F.3d at 271).

In the present action, Plaintiff argues the District denied her a FAPE by lowering expectations, reducing services, and failing to follow the IEP, and that the Hearing Officer's findings of fact are contradicted by non-testimonial evidence and the contrary statements of witnesses. (Doc. 21, at 25; Doc. 27, at 5). First, Plaintiff argues "[i]f the basketball team could hold in-person indoor practices and travel to other school districts to play in-person indoor games, then the District could have educated Abby's four-student class in-person. The Hearing Officer's contrary conclusion, heedless of the law and the facts of record, is evidently erroneous." (Doc. 21, at 21). Second, Plaintiff asserts the District failed to fully implement her IEP, referring to testimony by Abby's special education teacher, Kathryn McLane. (Doc. 21, at 24) (citing Doc. 7-6, Admin. Tr. 105:22-108-25, 129:13-130:12, 171:25-173:14, July 9, 2021). Third, Plaintiff argues the District either reduced Abby's related services, such as physical, occupation, and speech and language therapy, or, if it provided those services, the District "admitted that they were incompatible with a virtual education." (Doc. 21, at 25) (citing Doc. 7-8, at 64, 125). Fourth, Plaintiff avers the virtual setting "forced the IEP team to change several goals in Abby's IEP, reducing the expectations; furthermore, a behavioral goal was not implemented, while baselines for other goals could not be established in the virtual format." (Doc. 21, at 25 (citing Doc. 7-6, Admin. Tr. 101:2-104:10, July 9, 2021); Doc. 27, at 6). Plaintiff relies on testimony by Abby's autistic support teacher, Katheryn McLane. (Doc. 21, at 25) (citing Doc. 7-6, Admin. Tr. 173:15-21, July 9, 2021; Doc. 7-8, 139, 142, 147-48). Finally, Plaintiff asserts the Hearing Officer's findings of fact are erroneous because the evidence shows Abby was not able to learn virtually and that she actually regressed academically and behaviorally during virtual instruction. (Doc. 21, at 25; Doc. 27, at 6-7).

Conversely, the District asserts "[t]here is no evidence presented establish that the [IEP] goals were not reasonably calculated to yield meaningful educational benefit to the student. Furthermore, there has been no evidence presented to establish that the student had needs in any areas other than those identified in the IEPs." (Doc. 26, at 12). The District contends Plaintiff's argument that Abby was unable to access the virtual curriculum is not supported by the record, citing testimony from Abby's autistic support teacher, Katheryn McLane, and the IEE report. (Doc. 26, at 13 (citing Doc. 7-6, Admin Tr. 111:10-113:7, 171:5-8, 175:6-14, July 9, 2021; Doc. 7-8, at 17, 19); Doc. 28, at 6). Next, the District asserts that given the circumstances of the COVID-19 pandemic, it "did what it could, and what it was required to do, in order to meet the Student's needs. Of course changes were made, as they were for all students." (Doc. 26, at 14). The District argues the fact that varsity basketball was allowed to play before Abby returned to in-person instruction "has nothing to do with whether [Abby] received FAPE." (Doc. 26, at 15). Finally, the District also argues that Abby did make progress in her related services and that Plaintiff's own testimony supports the Hearing Officer's conclusion. (Doc. 18, at 5-6).

Upon review of the record before the Court and the Hearing Officer, though Plaintiff argues otherwise, the Court finds that there is no evidence to support the assertion that Abby's IEPs were deficient and that virtual instruction denied Abby a FAPE. "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S.Ct. at 999 (emphasis in original). "The IEP *must aim* to enable the child to make progress." *Endrew F.*, 137 S.Ct. at 999 (emphasis added). The Court may not rely on hindsight to second-guess an educational program that was reasonable at the time.

On May 28, 2020, an IEP was developed for Abby. (Doc. 7-8, at 53). The IEP was in effect from May 28, 2020, through December 22, 2020. (Doc. 7-8, at 23). The IEP includes goals for number and letter matching, a social/emotional goal, and two behavioral goals. (Doc. 7-8, at 59-60). The IEP also provides for a number of modifications and specially designated instruction. (Doc. 7-8, at 60-61). In addition, the IEP provides for related services of speech/language therapy, occupational therapy, and adaptive physical education. (Doc. 7-8, at 62-65). On December 22, 2022, an IEP was developed for Abby, which was in effect from December 22, 2020, through the relevant time period. (Doc. 7-8, at 112). This IEP was identical to the previous IEP, except that changes were made to reflect virtual instruction, including: Zoom sessions five (5) days a week and optional google classroom assignments four (4) days a week; participation in circle instead of occupational therapy two (2) days a week; one (3) 30-minute virtual session with a speech therapist and classroom teacher. (Doc. 7-8, at 118-126). It is undisputed that Plaintiff participated in the IEP team meeting that resulted in the December 22, 2022, modification and that Plaintiff agreed with the changes that were made. (Doc. 7-6, Admin. Tr. 143:9-24, July 9, 2021).

The Hearing Officer found "[t]he IEPs developed by the school district for the student were reasonably calculated to provide meaningful educational benefit in view of the student's unique circumstances." (Doc. 7-3, at 11). The Hearing Officer also found "[t]he school district's provision of virtual instruction to the student instead of in-person instruction during the relevant time period did not violate IDEA. The school district has not discriminated against the student on the basis of a disability." (Doc. 7-3, at 11). Based on his conclusions of law, the Hearing Officer explained:

> At the time that they were written, the student's IEPs were clearly designed to meet the student's needs. The student's IEPs adopted many of the

> recommendations contained in the independent educational evaluation of the student. The IEPs included academic goals and goals to address the student's behavioral and social/emotional needs. The IEPs included appropriate specially designed instruction and modifications. The IEPs provided the related services of speech/language, physical therapy, occupational therapy and adaptive physical education.
>
> Moreover, even though the appropriateness of an IEP must be judged at the time that it was written, and IDEA does not require any guarantee of success, the student did in fact make progress under the student's IEPs, including during virtual instruction.

(Doc. 7-3, at 12).

The Hearing Officer noted that Abby's IEP was amended on December 22, 2022, to reflect changes that were necessitated because she was receiving virtual instruction at that time. (Doc. 7-3, at 12). The Hearing Officer explained, "[i]n view of the fact that the virtual instruction of the student was occurring during an ongoing and deadly global public health crisis, the changes to the student's IEP were clearly made within a reasonable period of time." (Doc. 7-3, at 12).

Next, the Hearing Officer concluded that Plaintiff did not prove that the District denied a FAPE to Abby. (Doc. 7-3, at 13). Notably, the Hearing Officer found Plaintiff's testimony to be less credible and persuasive than the testimony of the District's staff due to Plaintiff's demeanor, as well as the following:

> The parent testified that the parent paid for a nurse to be present in the parent's home during the student's virtual instruction. The school district's special education director testified that the school district paid for nursing services for the student during virtual instruction. The parent then doubled down on this testimony when recalled to testify a second time during the hearing. At the request of the parent's counsel, the hearing officer permitted counsel for both parties to submit documentary evidence pertaining to payment for nursing services for the student within five days after the hearing concluded. In addition, counsel for each party was permitted an additional two days to object to any documentary evidence provided on this issue. Counsel for the school district submitted records showing that the school district had in fact paid for the nursing services for the student. Counsel for the parent did not submit any

> documents showing any contrary facts. The parent did not object to the
> documentary evidence submitted by the school district showing that the school
> district had paid for the nursing services. Thus, the documentary evidence
> concerning this point contradicted the testimony of the parent and corroborated
> the testimony of school district staff. Clearly the school district and not the
> parent paid for the student's nurse. The parent's credibility is seriously impaired
> by this testimony.

(Doc. 7-3, at 13).

The Hearing Officer rejected Plaintiff's contention that virtual instruction is in itself a

violation of IDEA, explaining that "parents cannot dictate the manner in which the student

is educated because IDEA accords the discretion to select among the various methods for

educating a student with a disability." (Doc. 7-3, at 14) (citing *Ridley Sch. Dist.*, 680 F.3d at

260).

Concerning the period from November 24, 2020, through February 16, 2021, the

Hearing Officer explained:

> [T]he record evidence reveals that virtual instruction was appropriate for the
> student. Significantly, the recommendations of the evaluator who conducted
> the independent educational evaluation for the student included a conclusion
> that the student ". . . does well and has a preference for learning on
> devices/iPads." That the student does well when learning from iPads and other
> devices was confirmed by the student's teacher. The school district's special
> education director testified credibly and persuasively that in-person instruction
> is best for most children, but this student can learn virtually. The student's
> teacher testified that although virtual instruction presents a number of
> challenges, the teacher was able to provide instruction to the student virtually.
> In addition, the record evidence shows that the student received related services
> successfully during virtual instruction.

(Doc. 7-3, at 14-15).

Concerning the four specific days of March 12 and March 19, 2021, and April 26 and 27,

2021, the Hearing Officer opined that no reasonable argument can be made that Abby should

have been permitted into the school for in-person instruction because "the school buildings in

the District were shut down pursuant to a directive by the Department of Health because of

specific cases of COVID-19 and a resulting need to deep claim the school buildings." (Doc. 7-3, at 14).

The Hearing Officer emphasized that the IDEA does not require an ideal education. (Doc. 7-3, at 15) (citing *Hampshire Regional Educational Agency*, 121 LRP 18232 (SEA Mass. 2021) (Massachusetts hearing officer found special education student received FAPE where student's IEP was appropriate, even when he struggled with virtual instruction during the COVID-19 pandemic). The Hearing Officer also rejected Plaintiff's argument concerning other children with disabilities, as a group, because the focus of the IDEA is the individual. (Doc. 7-3, at 15-16). Finally, the Hearing Officer rejected Plaintiff's reliance on a Pennsylvania hearing officer's decision as misplaced because the parent in that case, unlike here, was *seeking* virtual instruction for the student. (Doc. 7-3, at 16). In sum, the Hearing Officer concluded that Plaintiff did not prove that the District denied a FAPE to Abby. (Doc. 7-3, at 16).

The Hearing Officer's conclusion that Abby was provided a FAPE from November 24, 2020, through February 16, 2021, and on four additional specific dates, March 12 and 19, 2021, and April 26 and 27, 2021, shall be upheld. As noted *supra,* "the IDEA demands . . . an education program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. The Third Circuit has held that an IEP must be evaluated by its appropriateness at the time it was proposed. *D.S.*, 602 F.3d at 564–65. The Court "must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'" *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199.

Evidence in the record supports the Hearing Officer's finding that the District did provide Abby with a FAPE through distance instruction and that Abby was able to learn virtually. (Doc. 7-6, Admin Tr. 111:10-113:7, 171:5-8, 123:2-11, 175:6-14, July 9, 2021; Doc. 7-8, at 17, 19). At the time they were developed, Abby's IEPs were reasonably calculated to allow her to make meaningful education benefit and the District amended those IEPs to permit Abby to access the curriculum virtually once the District decided to transfer all students from in-person instruction to virtual intrusion. (Doc. 7-8, at 18-22, 47-52, 63-65, 255-257). Moreover, the USDOE specifically embraced an approach of granting schools, like the District, maximum flexibility to keep their students safe so long as they continue to offer all students a FAPE so long as the administrative decision to continue virtual instruction is applied systemwide. *See generally* USDOE Q&A; USDOE Supplemental Fact Sheet; *see also J.T.*, 500 F.Supp.3d at 187. In addition, though certain witnesses testified that Abby should have returned to in-person instruction "as soon as possible," there is evidence in the record to suggest that Abby was able to learn virtually and make meaningful progress. (Doc. 7.6, Admin. Tr. 49:2-7, 113:24-114:8, 121:23-122:16, 139:19-143:24, July 9, 2021). The District's Director of Special Education, Michelle Hopkins, and Abby's autistic support teacher, Katheryn McLane, testified that, although Abby's IEP goals were adapted due to difficulties in the virtual setting, the District was able to provide instruction to Abby. (Doc. 7-6, Admin Tr. 103:24-104:10, 122:8-16, 171:5-8, 175:6-14, July 9, 2021). For example, the IEE report explained that Abby liked learning on devices, such as iPads, and recommended using an iPad as a developmental-pragmatic approach to encourage the development of multiple aspects of communication. (Doc. 7-8, at 41, 49). During virtual instruction, Abby was also

able to receive related services including speech therapy, occupational therapy, and physical therapy. (Doc. 7-8, at 58).

Giving due weight to the findings of the Hearing Officer, including his finding that Plaintiff's testimony lack credibility and that Abby was able to learn virtually, the Court determines that the District's IEP was "reasonably calculated to enable [her] to receive meaningful education benefits in light of [her] intellectual potential . . . and individual abilities." *Ridley*, 680 F.3d at 269; *see K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 256 (3d Cir. 2018) (treating the hearing officer's factual findings as "prima facie correct"); *S.H.*, 336 F.3d at 270 (same).

To the extent that the Hearing Officer concluded the District provided Abby a FAPE during virtual instruction despite allowing the District's basketball team to return to in-person practice while Abby remained in virtual instruction, the Court declines to overturn the Hearing Officer's findings. At the administrative level, Plaintiff argued that the basketball team's return to in-person practice established that the District discriminated against Abby on the basis of her disability in violation of Section 504. (Doc. 7-3, at 16). The Hearing Officer found that the discrimination issue was not properly alleged, and therefore should be rejected, because "there is no mention of basketball or extracurricular activities in the due process complaint." (Doc. 7-3, at 17). Assuming, *arguendo*, that the discrimination issue was properly before him, the Hearing Officer found:

> [T]he record evidence in this case does not support the contention that [Abby] has been discriminated against. Although the school board made a peculiar and highly questionable decision to permit basketball practices and games during the period from January 4, 2021, through February 16, 2021, the extracurricular basketball activities are not comparable to academic instruction. There is no evidence, for example, that [Abby] was not permitted to participate in any extracurricular activity because of [Abby]'s disability. Similarly, there is

no evidence that [Abby] was selected for virtual instruction because of [Abby]'s disability.

(Doc. 7-3, at 17).

In the instant case, Plaintiff does not assert a discrimination claim under Section 504, but contends that the District's failure to allow Abby to return to in-person instruction while allowing the basketball team to return to in-person practice is evidence of deprivation of FAPE from February 1, 2021, to February 16, 2021. (Doc. 21, at 20). The complaint asserts that "while the District was closed for in-person learning, it allowed in-person varsity sports, including practices and games against other competing districts." (Doc. 1, ¶ 5).

The Court finds that the analysis in *J.T. v. de Blasio*, 500 F.Supp.3d 137 (S.D.N.Y. 2020), instructive. In *J.T.*, a group of parents brought a nationwide class action arguing that when schools throughout the country shut down due to the COVID-19 pandemic, the change to remote learning automatically altered the educational placement of every special needs student in the United States, such that they were denied a FAPE. *J.T.*, 500 F.Supp.3d at 147-48. The court concluded that a system-wide decision of general applicability "does not work a change in pendency." *J.T.*, 500 F.Supp.3d at 188-89; *see also N.D. v. Haw. Dept. of Educ.*, 600 F.3d 1104, 1116 (9th Cir. 2010) (concluding that system-wide closures and furloughs were not a change in educational placement because the children's classifications, schools, and educational programs remained the same); *D.M. v. New Jersey Dept. of Educ.*, 801 F.3d 205, 217-18 (3d Cir. 2015) (discussing difference between a broad policy decision that effects an entire group and an individually targeted decision). Further, the court explained that the switch to remote instruction impacted every student in the district; the City did not change any student's classification, district, or teacher. *J.T.*, 500 F. Supp. 3d at 189-90. The court further explained that the purpose of the IDEA was to ensure that children were not excluded

from the public school system and were being educated with their peers. The court observed that "Congress did not intend for the IDEA to apply to system wide administrative decisions." *J.T.*, 500 F.Supp.3d at 189 (quoting *N.D.*, 600 F.3d at 1116). As a result, the court refused to second guess a systemwide "administrative decision made to protect the lives and health of students and staff." *J.T.*, 500 F.Supp.3d at 189.

Here, much like the decision in *J.T.,* the District's change from in-person to virtual instruction applied to all students, abled and disabled alike. However, unlike the student-plaintiffs' arguments in *J.T.*, Plaintiff does argue that the pivot to virtual instruction caused Abby's IEP to be individually altered, which resulted in Abby allegedly regressing behaviorally and academically. (Doc. 21, at 21-25; Doc. 27, at 5-7). In this case, the systemwide administrative decision to continue virtual instruction from January 4 to February 16, 2021, did not apply to all students. In fact, the District allowed varsity basketball to return to in-person practice during the above-mentioned time period, while Abby was not allowed to return to in-person instruction until February 16, 2021. (Doc. 7-3, at 7-8). Despite the District's argument that Abby returned to in-person instruction as soon as feasible, the fact that the District's basketball team was permitted to return to in-person practice on January 4, 2021, suggests the District failed to apply the administrative decision to continue virtual instruction equally among the student population. The Court is aware that the Department of Health and Department of Education amended the recommendations on January 8, 2021, directing the school districts "to keep everyone virtual during the substantial transmission, and . . . bring elementary and at risk populations back as of February 1." (Doc. 7-6, Admin. Tr. 58:23-25-59:1-5). This may suggest that the District failed to provide Abby a FAPE from the period of February 1, 2021, through February 16, 2021.

Nevertheless, there is no evidence in the record to suggest that the District denied Abby a FAPE during the time period of February 1, 2021, through February 16, 2021. As discussed *supra*, an IEP must be evaluated by its appropriateness at the time it was proposed. *D.S.*, 602 F.3d at 564–65. The Court finds that the IEPs were reasonably calculated to allow Abby to make meaningful progress, the District did provide Abby with a FAPE through distance instruction, and Abby was able to learn virtually. (Doc. 7-6, Admin Tr. 111:10-113:7, 171:5-8, 123:2-11, 175:6-14, July 9, 2021; Doc. 7-8, at 17-22, 47-52, 63-65, 255-257). There is nothing in the record to suggest that Abby, like other disability students, was not able to receive a FAPE during the time period of February 1, 2021, through February 16, 2021, just because the basketball team was permitted to return to in-person practice. The fact that the District was willing and able to review and revise Abby's IEPs throughout her education supports the Hearing Officer's conclusion that the District provided Abby with a FAPE. Moreover, the USDOE guidance explicitly states that remote education is not a *per se* violation of the IDEA. *See generally* USDOE Q&A; USDOE Supplemental Fact Sheet. Although the Court agrees with the Hearing Officer that the "school board made a peculiar and highly questionable decision to permit basketball practices and games during [this] period," the Court finds that the IEP was appropriate, and Abby was provided a FAPE. Therefore, the Court finds that compensatory education is not warranted and will affirm the Hearing Officer's decision.

Accordingly, Plaintiff's motion for judgment on the administrative record will be DENIED (Doc. 20), and the District's motion for judgment on the administrative record will be GRANTED (Doc. 25).

C. SECTION 504, THE ADA, AND PENNSYLVANIA LAW CLAIMS

Plaintiff requests that the Court declare the District's actions and omissions to be violative of IDEA, Section 504, the ADA, and Pennsylvania law. (Doc. 21, at 28). However, Plaintiff does not provide an argument as to how the District's actions and omissions violated Section 504, the ADA, and Pennsylvania law. (Doc. 21; Doc. 27). The District does not address Plaintiff's additional claims in its motion for judgment on the administrative record or in its reply to Plaintiff's motion for judgment on the administrative record. (Doc. 26; Doc. 28).

To prevail on Section 504 and ADA claims, Plaintiff must prove that: (1) the child was "disabled," (2) the child was "otherwise qualified" to participate in school activities, (3) the school district received federal funding; and (4) the child was "excluded from participation in or denied the benefits of the educational program receiving the funds, or was subject to discrimination under the program." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275–76 (3d Cir. 2014). Here, the Hearing Officer denied Plaintiff's IDEA claim and Section 504 intentional discrimination claim, but did not address Plaintiff's Section 504, ADA, or Pennsylvania law claims. (Doc. 7-3, at 1-17). Notably, Plaintiff has chosen to forego their intentional discrimination claim under Section 504. (Doc. 21, at 8). Based on the foregoing discussion, the Court finds that the first three prongs are satisfied. Thus, the question is whether Abby was denied the benefits of a FAPE. Plaintiff argues that Abby was denied the benefits of the educational program and the District violated Section 504 and the ADA by failing "to provide [a] FAPE to Abby." (Doc. No. 1 ¶ 151.)

As discussed above, the Hearing Officer found, and the Court agrees, that the District *did* offer Abby a FAPE for the time period November 24, 2020, through February 16, 2021,

and on four additional specific dates, March 12 and 19, 2021, and April 26 and 27, 2021. As such, Plaintiff is not entitled to relief under Section 504 or the ADA. *See Richard S. v. Wissahickon Sch. Dist.*, 334 F. App'x 508, 509 n.1 (3d Cir. 2009) ("Appellants' § 504 and IDEA claims are factually indistinguishable, and the resolution of the IDEA claim is therefore also dispositive of the § 504 claim."); *Gwendolynne S. ex rel. Judy S. v. W. Chester Area Sch. Dist.*, No. 19-cv-3844-JMY, 2021 WL 949483, at *14 (E.D. Pa. Mar. 12, 2021) ("Plaintiffs failed to establish that Gwendolynne was denied a free, appropriate education, [so] the Section 504 and ADA claims fail."); *E.D. ex rel. T.D. v. Colonial Sch. Dist.*, CIVIL ACTION NO. 09-4837, 2017 WL 1207919, at *15 (E.D. Pa. Mar. 31, 2017) ("We determined that, consistent with the hearing officer's conclusion, Plaintiffs have failed to show that E.D. was denied a FAPE during the 2006-07, and 2007-08 school years. As a result, Plaintiffs are not entitled to compensatory damages.").

Accordingly, Plaintiff's motion for judgment on the administrative record will be DENIED (Doc. 20), and the District's motion for judgment on the administrative record will be GRANTED (Doc. 25).

### D. IS ABBY ENTITLED TO FULL DAYS OF COMPENSATORY EDUCATION TO REMEDY THE DISTRICT'S VIOLATIONS?

Finally, Plaintiff argues that because Abby failed to make meaningful progress and experienced behavioral and academic regressions due to her virtual education, Abby is entitled to full days of compensatory education, regardless of the District's motives or intent. (Doc. 21, at 26). Because Abby's school day was 6 hours and 5 minutes in length and her virtual instruction lasted 53 school days, Plaintiff states that Abby is entitled to a minimum of 322 hours of compensatory education, to be used in a manner Plaintiff controls, not the District. (Doc. 21, at 28 n.3). Conversely, the District asserts that the remedy of compensatory

education is not available because the record is devoid of any substantive harm to Abby. (Doc. 26, at 16).

The IDEA grants district courts broad discretion in fashioning a remedy for a denial of a FAPE. 20 U.S.C. § 1415(i)(2)(C)(iii) (stating that the court "shall grant such relief as the court determines is appropriate"); *see Sch. Dist. of Phila. v. Post*, 262 F.Supp.3d 178, 197 (E.D. Pa. 2017). Determining what relief is warranted is a case by case analysis under which the "court will evaluate the specific type of relief that is appropriate to ensure that a student is fully compensated for a school district's past violations of his or her rights under the IDEA and develop an appropriate equitable award." *Ferren C.*, 612 F.3d at 720. Compensatory education, or the "replacement of educational services the child should have received in the first place," is one possible remedy available for the deprivation of the right to a FAPE. *Ferren C. v. Sch. Dist. of Philadelphia*, 595 F. Supp. 2d 566, 577 (E.D. Pa. 2009) (quoting *Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)); *Lester H. v. Gilhool*, 916 F.2d 865, 872–73 (3d Cir. 1990). There is no requirement that "the district's behavior . . . rise to the level of slothfulness or bad faith" for compensatory education to be an appropriate remedy. *M.C.*, 81 F.3d at 397. Where compensatory education is warranted, the student "is entitled to [it] for a period equal to the period of deprivation, excluding the time reasonably required for the school district to rectify the problem." *M.C.*, 81 F.3d at 397.

Procedural violations of the IDEA, particularly in relation to an IEP, typically only justify prospective injunctive relief, not compensatory relief or tuition reimbursement. *C.H. v. Cape Henlopen Sch. Dist.,* 606 F.3d 59, 66 (3d Cir. 2010). However, "a school district's failure to comply with the procedural requirements of the [IDEA] will constitute a denial of a FAPE . . . if such violation causes substantive harm to the child or his parents." *C.H.*, 606

F.3d at 66. Substantive harm occurs when a party can establish, by a preponderance of the evidence, that "the procedural inadequacies (i) [i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit." *C.H.*, 606 F.3d at 67 (quoting 34 C.F.R. § 300.513(a)(2)) (alteration in original).

The Hearing Officer found the District provided Abby with a FAPE from November 24, 2020, through February 16, 2021, and on four additional specific dates: March 12, 2021, March 19, 2021, April 26, 2021, and April 27, 2021, declining to grant Abby an amount of compensatory education. (Doc. 7-3, at 11). Notably, the Hearing Officer made the following finding of fact:

> The school district offered COVID compensatory services to the student to help remediate losses suffered during virtual instruction. The compensatory services were individually designed for each student. During the previous IEP team meeting, the school district made the parent aware that COVID compensatory services would be offered to the student during the summer. The parent declined to have the student receive the COVID compensatory services. The parent chose to send the student to a summer camp instead.

(Doc. 7-3, at 9) (citing Doc. 7-8, Admin. Tr. 116:19-117:17, July 9, 2021).

Concluding that Plaintiff has not proven that the District denied a FAPE to Abby, the Hearing Officer denied all relief requested in the due process complaint and dismissed the due process complaint. (Doc. 7-3, at 18).

The Court finds that the record is devoid of any procedural defects that arose to the level of substantial harm necessary to award the compensatory education sought. The Third Circuit has determined that a dispute about the specific contents of an IEP is a substantive claim. *See, e.g., D.S.,* 602 F.3d at 565. Accordingly, it is evaluated based on whether the IEP

provided a meaningful educational benefit. *See, D.S., 602 F.3d at 565*. Abby received meaningful educational benefit during the period from November 24, 2020, through February 16, 2021, and on the four specific days of March 12 and March 19, 2021, and April 26 and 27, 2021, even if the benefit was not optimal. Thus, the District did not deny Abby a FAPE during this period and the record does not support awarding the relief sought by Plaintiff.

Accordingly, Plaintiff's motion for judgment on the administrative record will be DENIED (Doc. 20), and the District's motion for judgment on the administrative record will be GRANTED (Doc. 25).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the administrative record (Doc. 20) is **DENIED** and the District's motion for judgment on the administrative record (Doc. 25) is **GRANTED**. The Hearing Officer's decision is **AFFIRMED**, final judgment will be entered in favor of the District and against Plaintiff, and the Clerk of Court is directed to **CLOSE** this case.

An appropriate Order follows.

BY THE COURT:

Dated: March 14, 2023                    *s/ Karoline Mehalchick*
                                         **KAROLINE MEHALCHICK**
                                         **Chief United States Magistrate Judge**